UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION – LONDON

*ELECTRONICALLY FILED*

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | | CASE NO. 6:14-CR-37-GFVT-HAI |
| Plaintiff, | | |
| v. | : | Hon. U.S. Dist. Judge Gregory Van Tatenhove |
| **JAMES ALVIN CHANEY, and** | : | **DEFENDANTS' MEMORANDUM** |
| **ACE CLINIQUE OF MEDICINE, LLC,** | | **CONCERNING GUIDELINE** |
| | : | **CALCULATIONS OF DRUG QUANTITY** |
| Defendants. | | **AND HEALTH CARE FRAUD LOSS** |

On August 17-18, 2017, this Court held an evidentiary hearing concerning certain objections raised by Defendants James Chaney, Lesa Chaney, and Ace Clinique of Medicine LLC ("ACM"). Following the hearing, this Court permitted briefing to be conducted on two issues: (1) drug quantity attributable to the Defendants for sentencing purposes; and (2) loss attributable to health care fraud. (R.454, Order, Page ID# 9437).[1]  By and through the undersigned counsel, Defendants James Chaney and ACM hereby provide the following Memorandum:

**DRUG QUANTITY**

In the Presentence Investigation Report (PSR) for Defendants James A. Chaney and ACM, the United States Probation Office provides that 3,332,846 Schedule II prescriptions and 5,107, 652 Schedule III prescriptions were "improper" (*See* PSR ¶13).[2]  This calculation was obtained by the FBI who reviewed KASPER records. (See PSR, Objection #2, Page 39-40). The prescriptions of oxycodone and hydrocodone were subsequently converted to the marijuana

---

[1] The other objections raised by Defendants concerning the PSRs will be addressed at the Sentencing scheduled on September 21, 2017.
[2] ACM PSR ¶29

1

equivalency of 277,950.564 kilograms (PSR ¶ 15)[3], making Dr. Chaney's Base Offense Level a 38 (PSR ¶ 35). This drug quantity impacted the adjusted offense levels, the loss calculation, the restitution amount, and the Total Offense Level of 43. (PSR ¶ 140). The undersigned objected and continues to argue that the "all-inclusive" calculations fail to consider the prescriptions written with a legitimate medical purpose, and these calculations entirely rely upon KASPER data that is inaccurate and unreliable.

**Special Agent Thad Lambdin's Testimony**

At the Evidentiary Hearing held on August 17, 2017, FBI Agent Thad Lambdin ("Lambdin") testified on behalf of the government. (R.459, Transcript, Page ID# 9450-9497). Lambdin stated that he used Dr. Chaney's DEA Number to obtain the KASPER records (*Id.* at Page ID# 9456, and 9487-9488), and the date range used was from January 1, 2007 through August 8, 2014. (*Id.* at Page ID# 9457, and 9495). Per Lambdin, the KASPER data is entered by pharmacies as they fill prescriptions, and "entry errors can occur" including the intermixing of Dr. James A. Chaney's prescriptions with Dr. James Dustin Chaney's prescriptions. (*Id.* at Page ID# 9461).

During his testimony, Lambdin asserted that the data and charts provided for the Court's consideration were accurate based on his "work as a data extraction technician with the FBI." (*Id.* at Page ID# 9463-9464). Yet, he later admitted that a data extraction technician merely images computer hard drives forensically and extracts data from digital evidence (*Id.* at Page ID# 9484-9485). Lambdin further admitted that he failed to confirm the validity of the KASPER data and could not provide a margin of error in any regard (*Id.* at Page ID# 9488 and 9494). He said, "Having not talked to KASPER or the others, I don't know what the significant errors could

---

[3] ACM PSR ¶31

2

be at the pharmacies. I don't have a feel for that." (Id. at Page ID # 9494).

He did not perform an audit at the pharmacies to credential their input accuracy, nor did he seek information concerning the extent of training the employees received, if any, on the KASPER software. (*Id.* at Page ID # 9489). He was unable to testify whether pharmacy clerks relied on the DEA Number, the doctor's signature, or the doctor's name printed at the top of the script. (*Id.* at Page ID #9494). As a Microsoft Excel layman (*Id.* at Page ID # 9491), the only restrictions Lambdin utilized in accessing the KASPER data was a date range and Dr. Chaney's DEA Number. (*Id.* at Page ID #9492-9493). Thus, he could not ascertain how often Dr. James Dustin Chaney's prescriptions were mistaken for Dr. James A. Chaney. (*Id.*) However, Dr. James Dustin Chaney had testified at Dr. James A. Chaney's trial that he personally found several errors in KASPER reports. (R.320, Transcript, Page ID #4585).

Lambdin repeatedly testified concerning the "significance" of certain data (*Id.* at Page ID# 9477, 9480, etc.), and even defined "standard deviation" for the Court's understanding. (*Id.* at Page ID# 9478-9479). Yet, Lambdin is not a statistician (*Id.* at Page ID# 9483) and he has not been formally trained in statistics (*Id.* at Page ID# 9483-9484). In fact, he only had one statistics course in the 1990's. (*Id.* at Page ID# 9484). Additionally, he has had no formal training concerning the use of Microsoft Excel (*Id.* at Page ID# 9485, and 9487) and failed to even manually compute the calculations provided by the software to ensure reliability and accuracy (*Id.* at Page ID# 9489-9491).

More importantly, Lambdin was unable to testify whether any of the prescriptions provided in his calculation included prescriptions written for a legitimate medical purpose. (*Id.* at Page ID# 9491 and 9494). Part of the testimony follows:

> Defense Attorney Abell: "We are -- these are gross numbers, without consideration of medical necessity or appropriateness of any of the prescriptions reflected, correct?

3

Lambdin:  That is correct. These are the straight numbers reported to KASPER.

Defense Attorney Abell: And that is true with regard to all Schedule III and Schedule II prescriptions that are reflected on Exhibits 1 and 2; is that correct?

Lambdin:  That is correct. These are directly from the KASPER system only. (*Id.* at Page ID# 9494-9495).

Lambdin's testimony concerning the prescriptions, charts, graphs and statistics should be completely disregarded.  The proposed drug calculation offered by the United States was based on empty facts and incompetent evidence without even a minimal amount of reliability.  Mere speculation is insufficient and the government failed to meet its burden of proof.  The testimony presented by Arnold J. Stromberg, PhD, (R.460, Transcript, Page ID# 9574-9591), Dr. Larry Russell, M.D., C.M.D. (*Id.* at Page ID# 9609-9650), Defendant James A. Chaney (R.459, Transcript, Page ID# 9520-9565), and Dr. John Gilbert, M.D. (R.460, Page ID# 9592-9610) provide reliable information for this Court to derive a reasonable estimate.

**Dr. Arnold J. Stromberg's Testimony**

Dr. Arnold Stromberg ("Stromberg") is employed at the University of Kentucky as the Department Chair for the Department of Statistics. (R.460, Transcript, Page ID# 9575).  He has been employed at the University of Kentucky for twenty-six years (*Id.*) and was retained as an expert by Defendant Lesa Chaney to "determine a sampling method and a sample by which the proportion of fraudulent cases could be identified." (*Id.* at Page ID# 9576-9577). Stromberg determined that there were approximately seventy-four thousand controlled substance prescriptions (*Id.* at Page ID# 9577-9578), and he was asked to identify a number that would be a statistically reliable numerical sample. (*Id.* at Page ID# 9578).  The goal of providing a "statistically reliable numerical sample" is to estimate the true proportion of fraudulent claims for prescriptions by randomly selecting files.  *(Id.)*  Concerning the 100 prescriptions chosen,

Stromberg testified, "[a]nd by selecting 100, we have a compromise in getting a reasonably accurate estimate without a ridiculous amount of effort. And we wanted to know exactly, we would have to review all the claims, and that isn't necessary from a statistical point of view" (*Id.* at Page ID# 9579-9580).

Defendant Lesa Chaney's counsel asked Stromberg if he was aware that Dr. Russell was unable to review all 100 files for prescriptions or the 100 files for claims, and asked if the lesser number impacted the reliability of the sample statistically. (*Id.* at Page ID# 9581). Stromberg testified that it did not because "the files that were reviewed still represent a random sample from the population of claims." *Id.*

Stromberg had the opportunity to review the reports submitted by Dr. Russell and his testimony concerning Dr. Russell's findings follows:

> Defense Attorney Abell: Okay. Now, putting aside any prescriptions that were addressed or encompassed by the jury verdict, and with regard to the prescriptions, are you able to draw any conclusions from Dr. Russell's report regarding the most statistically reliable number of controlled substance prescriptions that would not be supported by a legitimate medical purpose?
>
> Stromberg: So it's actually an interesting situation because none of the claims reviewed were found to be fraudulent, and so that makes the estimate – the estimate zero. And while we know that the jury found fraudulent claims, we didn't find any evidence of fraudulent claims.
>
> Defense Attorney Abell: Would it be a fair conclusion then that dealing first with prescriptions, that beyond any prescriptions addressed by the jury by its verdict, the most statistically reliable conclusion is that there are no additional prescriptions not supported by a legitimate medical purpose?
>
> Stromberg: Correct. (*Id.* at Page ID# 9582-9583).

**Dr. Larry Russell's Testimony**

Dr. Larry Russell ("Russell") testified on August 18, 2017. He is board certified in family medicine and has practiced in both Kentucky and North Carolina for close to thirty years.

(*Id.* at Page ID# 9612). His medical practice involves patients with a variety of medical issues including those suffering from diabetes, heart disease, chronic pain, degenerative disease of the spine and other chronic medical problems. (*Id.* at Page ID# 9613-9614). He was retained as an expert by Defendant Lesa Chaney *(Id.* at Page ID# 9613) to review a randomized sample of patient files that was specific to dates of care, and asked to provide an honest opinion whether those files were within the usual standard practice of medicine. (*Id.* at Page ID# 9615).

He performed two types of reviews. One was to review patient charts with respect to the prescriptions written and the other review was concerning the medical services and procedures rendered to determine if the services and procedures were medically necessary and appropriate. (*Id.* at Page ID# 9615-9616). Originally, he was asked to review 100 patient charts for each type of review but not all files were available. (*Id.* at Page ID# 9616). Concerning the Procedural Review, Russell reviewed 87 patient charts. (*Id.* at Page ID# 9643). He reviewed 78 patient charts for the Pharmacy Review. (*Id.* at Page ID# 9621).

When conducting the reviews, Russell noted that a few of the patients were moved off hydrocodone or oxycodone to Suboxone (*Id.* at Page ID #9623), and one was fired from receiving treatment because the patient was not regularly attending Narcotics Anonymous. (*Id.* at Page ID# 9624). Russell stated that "good medical care" was shown by Dr. Chaney's implementation of a pain management doctor (Dr. Wright) (*Id.* at Page ID# 9626-9627). On estimate, Russell opined that out of the 78 charts reviewed, Dr. Chaney referred patients to Dr. Wright as a pain management specialist in about 56-57 of those charts. (*Id.* at Page ID# 9629). He noted that Dr. Wright would often increase the pain medication or frequency that Dr. Chaney had prescribed (*Id.* at Page ID# 9627-9628).

His findings were detailed in his report titled "Chaney Pharmacy Review" (*See* SH 10).

He noted that all the charts he reviewed had pain contracts signed by the patient; and all but one chart had a questionnaire about the patient's pain and prior history. (*Id.*)  He indicated that "[c]ommon sense says Dr. Wright's confirmation of the current plan and, not in frequent, increase in the amount of narcotic given add legitimacy the use of the medication in those particular patients." (*Id.*).  "Except for a few of the charts, the overall amount of narcotic was certainly well under the current (2017) recommendation of no more than 100 mg of morphine equivalent daily." (*Id.*)  He concluded that in every case he reviewed, "the narcotics were prescribed for a 'legitimate medical purpose and within the usual course of professional medical practice'" and the use of narcotics appeared to be "medically necessary and appropriate." (*Id.*)

It appears that during Russell's cross-examination, AUSA West indicated that the unlawful dispensation of controlled substances did not involve nursing homes or hospitals. (*Id.* at Page ID# 9643).  However, 20-30 % of the government's proposed drug quantity includes Dr. Chaney's treatment of patients at nursing homes, hospitals, and home health.

### Dr. James A. Chaney's Testimony

Defendant James A. Chaney ("Chaney") testified on August 17, 2017.  He opened Ace Clinique of Medicine, LLC with a desire to provide a family practice that had a broad spectrum in which he could treat many issues – such as performing skin surgery for cancer patients, providing breathing treatments, treatment for hypothyroidism, pain management, and addressing dehydration (R.459, Transcript, Page ID# 9522-9525). He wanted to provide quality care and rather than have his patients drive to Lexington for specialist care, he had different specialties come to his office including plastic surgeons. (*Id.* at Page ID# 9525).  He even had a cardiologist come to his office to follow his patients with heart issues. (*Id.* at Page ID# 9523-9524).

Chaney treated several patients with chronic pain and his medical practice rendered "pretty extensive" screening on these patients. (*Id.* at Page ID# 9525). He defined "chronic pain" as pain lasting for three months or more on a daily basis (*Id.* at Page ID# 9526). The screening process included a psychosocial evaluation, a KASPER profile conducted on the patient, urine drug testing and a specialty consultation. (*Id.* at Page ID# 9526). "If it was, for example, a – potentially a surgical patient, they may see a neurosurgeon or an orthopedic surgeon, or may be seeing a rheumatologist for something that's not operable, for example, and, of course, pain management specialty." (*Id.*)

Chaney testified about the inaccuracies found in the KASPER data. "KASPER is fraught with errors." (*Id.* at Page ID# 9527). He testified that from a list of 1,208 prescriptions allegedly to be his, he found 1,207 of those prescriptions written by other doctors or nurse practitioners. (*Id.*) He also found inaccuracies in the date the prescription was filled as opposed to when it was written. (*Id.*)

Chaney was asked whether he cared about his patients. "Of course. I mean, what kind of question - - of course, I did." (*Id.* at Page ID# 9528). He provided an in-depth review of some of the patient files that were examined by Dr. Russell. He gave backgrounds to the patient's medical history and things that stood out most about the patient. Such as one patient that was a 'good guy' who died of colon cancer (*Id.* at Page ID# 9529), or the soccer mom that had bad asthma and needed immunoglobulin transfusions and had problems with her neck (*Id.* at Page ID# 9529-9530). He spoke compassionately about a patient that had blood clots in her legs and suffered from pulmonary emboli that killed her. When she was hospitalized he noticed her potassium levels were high. He said, "[a]nd I scratched my head trying to figure out and walking through the door what could cause this, you know. Maybe it was the lab work. And then I looked

8

on the table, and she had a whole, like a bushel full of tomatoes that she was eatin'. And, of course, that could cause the potassium to go high, and I kind of had to get onto her a little bit. And I kind of regret now that I did, but, you know ..." (*Id.* at Page ID# 9537).

He treated a coal miner with a bad spine that also had a defibrillator and inoperable heart disease. (*Id.* at Page ID# 9533). He spoke of a patient that was doctor shopping (*Id.* at Page ID# 9531), and one that was noncompliant with the Suboxone program and was fired as a patient (*Id.* at Page ID# 9545). He had many cancer patients and many suffering from diabetes and heart disease. (*Id.* at Page ID# 9529-9546).

Dr. Chaney was not only able to testify about the patient's complex medical conditions but also about their personal histories, their personalities, whether they were veterans, worked, or had large families. He referred to some patients as "a good ol' fella'" (*Id.* at Page ID# 9533), "a nice lady" (*Id.* at Page ID# 9529), "a little elderly lady" (*Id.* at Page ID# 9536), and "a sad case" (*Id.* at Page ID# 9537). One patient he referred to as "a kind of a special patient" because he treated her for 15-16 years. (*Id.* at Page ID# 9540). One patient was dying of lung cancer and refused to be taken to the hospital. He demanded his family to take him to see Chaney. (*Id.* at Page ID# 9542). He died on the way. Chaney said it was one of the saddest cases he'd ever seen. (*Id.*).

Chaney's testimony gave true insight into his desire to help his community by being a committed and caring physician seeking to render the best possible medical care to his patients.

**Dr. John Gilbert's Testimony**

Dr. John Gilbert ("Gilbert") testified on August 18, 2017. He has known Chaney on a professional level for approximately 20 years. (*Id.* at Page ID# 9593, 9601). Gilbert is a board-certified neurosurgeon and is board-certified in pain medicine and addiction medicine. Over the

years, he has seen hundreds, maybe thousands of Chaney's patients on a referral basis. (*Id.* at Page ID# 9593-9594). Gilbert published articles in peer-reviewed scientific journals and often he would share his research and publications with Chaney. (*Id.* at Page ID# 9594-9595). Based on the referrals and discussions with Chaney about his patients - Gilbert believed that Chaney cared about his patients and "took all the precautions." (*Id.*) Gilbert testified: "I saw hundreds, if not thousands of patients with -- if he wanted an addiction consult or pain consult, he used specialties. Many of them had already seen another pain physician; he wanted to get another opinion. Are they in pain or do they have addiction? And so I saw hundreds, if not thousands of his patients." (Id. at Page ID# 9596-9597).

In discussions with Chaney, Gilbert would give recommendations such as encouraging him to obtain an MRI or perform certain studies. (*Id.* at Page ID# 9597). He testified that due to the location of his practice, Chaney had very complex patients. (*Id.* at Page ID# 9598). Such as those that had diabetes, high blood pressure, heart failure, and other medical issues that required several specialists – such as cardiology and internal medicine. (*Id.*). "He had a lot of poor patients. I saw lots of patients from Dr. Chaney that had no money, no insurance, no nothing, but he was taking care of them, and he was providing good care." (*Id.*).

**Legal Argument**

"The calculation of drug quantities is an individual, fact-specific exercise that requires individual, fact-specific briefing." *United States v. Hough,* 276 F.3d 884, 891 (6th Cir. 2002). "Under section 2D1.1(c) of the Sentencing Guidelines, the district court must determine the quantity of drugs for which a defendant is responsible in order to determine her base offense level." *United States v. Huffman,* F29 F.App'x 426, 430 (6th Cir. 2013). "The court may make an estimate supported by competent evidence, but that the evidence supporting the estimate must

have a minimal level of reliability beyond mere allegation, and the court should err on the side of caution in making its estimate." *United States v. Sandridge,* 385 F.3d 1032,1037 (6th Cir. 2004). A district court may not 'hold a defendant responsible for a specific quantity of drugs unless the court can conclude the defendant is more likely than not *actually* responsible for a quantity greater than or equal to the quantity for which the defendant is being held responsible.'" *United States v. Jeross*, 521 F.3d 562 (6th Cir. 2008) (citing *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990).

When the drug quantities are disputed, the government bears the burden to prove, by a preponderance of the evidence, that a particular drug quantity applies. *United States v. Vasquez,* 560 F.3d 461, 471-72 (6th Cir 2009). If the government meets its burden of proof, the burden shifts to the defendant "to show that the correct quantity is less." *United States v. Washington*, 715 F.3d 975, 984-85 (6th Cir. 2013).

It is the position of Defendants James Chaney and ACM that the government has failed to meet its burden of providing any amount of fraudulent prescriptions of controlled substance that could support its marijuana equivalency of 277,950.564 kilograms. Furthermore, though the burden has yet to shift to Defendants - the Defendants have shown during the evidentiary hearing that the correct quantity is significantly less than the amount alleged by the government.

Considering the testimony at the evidentiary hearing, particularly of Dr. Stromberg and Dr. Russell, the Defendants argue that the drug quantity attributable to the Defendants for sentencing purposes is 80, 535 milligrams, or a marijuana equivalency of 539.6 kilograms pursuant to USSG § 2D1.1(c)(7), and the jury verdict of guilty on counts 2-62.

**HEALTH CARE LOSS**

In the PSR for Defendant James A. Chaney, the United States Probation Office provides that the Base Offense Level of 6 for Health Care Fraud should be increased by 20 levels because the loss amount of $16,524,541 was more than $9,500,000 but less than $25,000,000.  (*See* PSR ¶ 20).  Probation also recommends that the Base Offense Level be increased by three additional levels pursuant to USSG §2B1.1(b)(7)(ii), due to the belief that loss to the government health care program was more than $7,000,000. This loss amount is determined in part due to Probation's belief that none of the services rendered were supported by a legitimate medical need or were medically necessary and appropriate for the patient.

The undersigned objected and Probation responded that the information was received from the U.S. Attorney's Office, and "[t]he health care fraud resulted from ACM's improper dispensation of controlled substances and up-coded/false/unnecessary medical tests." (*See* PSR, Page 40, Response to Objection #3).  Defendants argue that the loss amount should be based on the specific counts of conviction.

**Aspen Taylor Testimony**

On August 17, 2017, Aspen Taylor ("Taylor") testified on behalf of the government concerning their effort to establish a loss amount.  Taylor is employed by the Kentucky Office of Attorney General in the Medicaid Fraud Control Unit and she works as a healthcare data administrator.  She does coding.  (R. 459, Transcript, Page ID# 9498*).*  She testified to loss amounts on behalf of Medicaid and the numbers were derived from an Excel spreadsheet.  (*Id.* at Page ID# 9501-9502). She testified that the total amount paid to ACM in claims was $9,477, 260.86 (*Id.* at Page ID# 9506).   She was unable to testify as to the medical necessity of the services rendered that were associated with those claims.  (*Id.* at Page ID# 9514).

Following her testimony, the United States directed the Court's attention to charts that

were used in their case-in-chief at trial. (*Id.* at Page ID# 9517-9518). Despite Taylor's testimony and the referenced charts – the government has simply failed to meet its burden of proof concerning the accuracy of their loss calculation of $16,524,541.00. As demonstrated by defense at the evidentiary hearing, most of the treatment and services rendered were medically necessary and appropriate.[4]

**Dr. Arnold J. Stromberg's ("Stromberg") Testimony**

Concerning the Medicare claims, Stromberg testified that there were approximately 69,577 Medicare claims provided for his review and he was asked to identify a statistically reliable numerical sample from that number. (R. 460, Transcript, Page ID# 9578). Like the prescription data, he determined that an appropriate sample would be 100 random files. Though 87 claims were reviewed, Stromberg did not believe the smaller number of claims reviewed would impact the reliability of the sample statistically (*Id.* at Page ID# 9581).

Stromberg stated that he had the opportunity to review the reports submitted by Dr. Russell and his testimony concerning Dr. Russell's findings follows:

> Defense Attorney Abell: Okay. With regard to claims, and we've discussed that the jury addressed some individual claims, but putting those aside, is it the most statistically reliable conclusion that beyond those, there are no additional claims for medical services or procedures that were medically unnecessary?
>
> Stromberg: Correct. (*Id. at Page ID#* 9583).

In cross, Stromberg provided an opinion about the actual dollar amount of loss: "Yes. The -- so the -- the only evidence that we found from the statistical selection is the dollar amount would be the amount that the jury found in the cases they determined to be fraudulent. So if -- if

---

[4] Please note that Defendants James Chaney and Ace Clinique of Medicine, LLC are not waiving their appellate claims concerning their innocence or the insufficiency of the evidence - but for sentencing purposes, they must recognize that they were convicted by a jury on several counts.

13

we had found -- yeah." (*Id.*at Page ID# 9590).

### Dr. Larry Russell's Testimony

In Russell's testimony concerning his procedural review of files, he noted that he saw references to nursing home visits, hospital visits including admissions, follow-ups, and discharges. Prostate cancer tests were ordered as were basic chemistry tests. (*Id.* at Page ID# 9630). He also reviewed claims for urine drug screens. He testified at length concerning random urine drug screens and indicated that for many years there were no protocols about how often to administer the screens. (*Id.* at Page ID# 9632). He stated that better suggestions were made in 2014 for pain management such as monthly pill counts, urine screens monthly, and the refusal to refill medication if these steps are not followed by the patient. (*Id.* at Page ID# 9632-9633). Russell referenced one patient that was treated by Chaney that had a variety of medical problems, including schizophrenia. This patient was fired from the practice for narcotic refills but was still treated for the other medical issues. (*Id.* at Page ID# 9636).

He found that Ace Clinique of Medicine, LLC was a "routine medical practice that also did pain management" (*Id.*) and was meeting the criteria that existed at that period. (*Id.*). He determined that the issuance of the controlled substance prescriptions, the procedures ordered, and claims for services were supported by a legitimate medical need and were medically necessary and appropriate for the patient. (*Id.* at Page ID# 9636-9637).

His findings were detailed in his report titled "Chaney Procedural Review" (*See* SH 11). He noted that "prior to 2014 there were no formal protocols for managing chronic pain patients and frequent UDS's were encouraged as a way to insure a patient's compliance." He opined that Dr. Chaney was "using strict and unbiased protocols to confirm the compliance of these patients which would have been in keeping with the standards of the time." (*Id.*). Russell was unable to

find any inappropriate billings.  He found that "most of the procedures clearly appear to be for a legitimate medical purpose and within the usual course of professional medical practice."   Even when he designated that a procedure "PROBABLY MEET CRITERIA" - because the specific test or associated progress note was not available – he still opined there was enough data to say that more likely than not – the procedure was medically necessary and appropriate.  (*Id.*)(See also, R.460, Transcript, Page ID# 9634-9635).

 Even the government's trial expert, Dr. Stephen Loyd, a hospitalist and internal medicine doctor (R. 415, Transcript, Page ID# 7597), who reviewed 17 patient files sent by the government (*Id.* at Page ID# 7604),  found that the patients were treated for a variety of medical issues including, but not limited to heart disease and diabetes (*Id.* at Page ID #7613-7614), spondylosis (*Id.* at Page ID# 7631), lupus and rheumatoid arthritis (*Id.* at Page ID# 7644), myofascial pain syndrome (*Id.* at Page ID# 7645), ventral hernia repair  (*Id.* at Page ID# 7655), post-traumatic stress disorder (*Id.* at Page ID# 7659), risk of suicide (*Id.* at Page ID# 7669-7671), significant lumbar disease (*Id.* at Page ID# 7692), and brain cancer (*Id.* at Page ID# 7700)  He found in some instances that Chaney rendered good care to his patients (*Id.* at Page ID#7693). He even commended Chaney for using "a very neat tool" that is a P3 interpretive report that helps "assess the contribution of psychiatric disorders in the treatment of chronic pain."  (*Id.* at Page ID# 7658-7659).

**Legal Argument**

 When determining the amount of loss – "a defendant will be held accountable for the actual or intended loss to a victim, whichever is greater, or a combination thereof." *United States v. Martinez*, 588 F.3d 301, 326 (6th Cir. 2009).  Due to the difficulty in calculating loss in a fraud case, the district court need only make a "reasonable estimate" supported by a preponderance of

the evidence. *United States v. Wendlandt,* 714 F.3d 388, 393 (6th Cir. 2013). The loss calculation must also offset the value of the medically necessary services and prescriptions that were provided by Dr. Chaney.

Application Note 3(E)(i) to USSG §2B1.1 provides that the value of "the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected" shall be credited against the amount of loss. Medically necessary goods and services given to Medicare/Medicaid beneficiaries fall under this provision and should be exclude from the amount of loss pursuant to *United States v. Fowler*, 819 F.3d 298 (6th Cir. 2016).

Plenty of the evidence provided by defense at trial and at the sentencing evidentiary hearing supports the argument that most of the drugs and services billed to Medicaid/Medicare pertained to services that were medically necessary. Even the government's own expert, Dr. Loyd, agreed to instances of medical necessity. Thus, the Defendants argue that the loss amount attributable to health care fraud for sentencing purposes is greater than $15,000 but less than $40,000, pursuant to USSG § 2B1.1(b)(1)(C).

## CONCLUSION

Finally, though Defendants were convicted on conspiracy to distribute/dispense Schedule II and Schedule III controlled substances, conspiracy to commit health care fraud; and maintaining premises for drug distribution – Defendants argue that the drug quantity calculation and loss amount should not include every Schedule II or III controlled substance prescription or every medical claim billed during the entire duration that Ace Clinique of Medicine, LLC was open. Rather, the Defendants ask that this Court hold the government to their burden and find their evidence insufficient and estimate the relevant drug quantity somewhere between 400

kilograms but less than 700 kilograms of marijuana equivalency, and estimate the loss amount attributable to health care fraud greater than $15,000 but less than $40,000.

                                        Respectfully Submitted,

                                        LOVE LAW FIRM, PLLC
                                        333 North Main St., Ste. B.
                                        Post Office Box 3105
                                        London, Kentucky 40743
                                        TELEPHONE: (606) 877-5683
                                        FAX: (606) 729-0854
                                        info@christylovelaw.com

                                        s/*Christy J. Love, Esq.*
                                        ATTORNEY FOR DEFENDANT

## **CERTIFICATE OF SERVICE**

      The undersigned certifies that on this 6th day of September 2017, the foregoing Memorandum was filed electronically with the Clerk of the Court by using CM/ECF System which will send notice of filing to all counsel of record.

                                          s/*Christy J. Love, Esq.*
                                        ATTORNEY FOR DEFENDANT